[Cite as *State ex rel. McCollum v. Ohio Police & Fire Pension Fund Bd. of Trustees*, 2018-Ohio-3874.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT


| | | |
|---|---|---|
| State of Ohio ex rel. Jason R. McCollum, | : | |
| Relator, | : | |
| v. | : | No. 17AP-530 |
| Board of Trustees, Ohio Police & Fire Pension[Fund], | : | (REGULAR CALENDAR) |
| Respondent. | : | |
| | : | |

D E C I S I O N

Rendered on September 25, 2018

**On brief:** *Robert J. Rohrbaugh, II*, for relator

**On brief:** *Michael DeWine*, Attorney General, *John J. Danish*, and *Mary Therese J. Bridge*, for respondent.

IN MANDAMUS

SADLER, J.

{¶ 1} Relator, Jason R. McCollum, commenced this original action requesting this court to issue a writ of mandamus ordering respondent, Board of Trustees, Ohio Police & Fire Pension Fund ("OP&F"), to vacate its June 27, 2017 decision denying his application for disability benefits and ordering OP&F to grant his application.

{¶ 2} Pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals, this matter was referred to a magistrate who considered the action on its merits and issued a decision, including findings of fact and conclusions of law, which is appended hereto. The magistrate found the June 27, 2017 report of Gregory Jewell, M.D., is some evidence on which OP&F can rely in finding that relator has zero percent whole person impairment

related to the alleged psychiatric conditions. The magistrate further found that relator's argument regarding OP&F ignoring the report of his doctor was not supported by evidence in the record and that no evidence showed relator raised to OP&F an argument challenging another doctor's credentials. After noting the clear and convincing standard of proof needed to grant mandamus relief, the magistrate recommended this court deny relator's request for a writ of mandamus.

{¶ 3} No objections have been filed to the magistrate's decision.

{¶ 4} After an independent review of the matter, we find the rationale of the magistrate to be consistent with *State ex rel. Marmaduke v. Ohio Police & Fire Pension Fund*, 147 Ohio St.3d 390, 2016-Ohio-5550, and precedent of this court. Having found no error of law or other defect evident on the face of the magistrate's decision, pursuant to Civ.R. 53(D)(4)(c), we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law, and conclude relator failed to demonstrate that OP&F abused its discretion when it denied relator's request for disability benefits. In accordance with the magistrate's decision, the requested writ of mandamus is denied.

*Writ of mandamus denied.*

BROWN, P.J., and BRUNNER, J., concur.

_____

# A P P E N D I X

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| The State ex rel. Jason R. McCollum, | : | |
| Relator, | : | |
| v. | : | No. 17AP-530 |
| Board of Trustees, Ohio Police & Fire Pension [Fund], | : | (REGULAR CALENDAR) |
| | : | |
| Respondent. | : | |
| | : | |

### M A G I S T R A T E ' S   D E C I S I O N
NUNC PRO TUNC[1]

### Rendered on April 2, 2018

*Robert J. Rohrbaugh, II,* for relator.

*Michael DeWine*, Attorney General, *John J. Danish,* and *Mary Therese J. Bridge,* for respondent.

### IN MANDAMUS

{¶ 5}   In this original action, relator, Jason R. McCollum, requests a writ of mandamus ordering respondent, board of trustees of the Ohio police and fire pension fund ("board") to vacate its June 27, 2017 decision that denied his R.C. 742.38 disability benefit application, and to enter a decision that grants the application.

Findings of Fact:

{¶ 6}   1. In June 2016, relator completed a form provided by the Ohio police and fire pension fund ("OP&F") captioned "Disability Benefit Application." On June 15, 2016,

---

[1] This magistrate's decision replaces, nunc pro tunc, the original magistrate's decision released March 27, 2018 which incorrectly indicates that counsel for respondent represent the Industrial Commission of Ohio in this action.

relator executed an affidavit on the form averring that the information provided is complete and true to the best of his knowledge and belief. The form is divided into several sections.

{¶ 7} Section A of the form requests "Member information." Therein, relator indicated that he held the rank of "patrolman" while employed by the city of Warren, Ohio. Relator marked a box indicating that he underwent an "involuntary separation effective: May 31, 2016."

{¶ 8} In section C, relator listed his dependents. Relator is married and has a dependent daughter.

{¶ 9} Section D of the form asks the applicant to "explain why you are permanently disabled from performing the duties of your title/rank." In the space provided, relator wrote in his own hand:

> Per my treating physicians Dr. Nalluri and Dr. Diorio I suffer from post traumatic stress disorder, anxiety, and depression resulting from my experiences working for the City of Warren Police Dept. They have advise[d] me that due to my conditions I pose a risk to the community, co-workers, and myself if I return to work. In their opinion this will worsen if I return. It is anticipated that treatment will continue for the remainder of my life.

{¶ 10} Section E asks the applicant for medical information. Relator indicates that he has a disabling "psychiatric" condition which he identifies as "PTSD, Anxiety, Depression." Psychiatrist, Anil Nalluri, M.D., is listed as the current attending physician. May 4, 2016 is identified as the "initial office visit date." July 2015 is listed as the "Date of onset."

{¶ 11} Section E of the form also asks the applicant to identify the medical documentation being submitted in support of the application. Relator identifies two documents: (1) a six-page narrative report from Dr. Nalluri regarding a May 4, 2016 examination, and (2) a May 5, 2016 emergency department discharge regarding relator's May 5, 2016 visit to the Northside Medical Center located in Youngstown, Ohio.

{¶ 12} 2. The record contains a copy of the six-page narrative report from Dr. Nalluri identified in the disability benefit application. Captioned "Fitness For Duty Report." Dr. Nalluri states:

> **Diagnostic Impression**
> [One] (F43.11) Post-traumatic Stress Disorder, Acute

[Two] (F41.1) Generalized Anxiety Disorder
[Three] (F32.1) Major Depressive Disorder, Single Episode, Moderate

* * *

Mr. Jason McCullom was interviewed by me Wednesday, May 4, 2016 with the agreement that I would provide for him a comprehensive report detailing the state of his mental health and the diagnoses and recommendations that I have found to be relevant in his case.

His symptoms are to the point that they are interfering with his activities of daily living in both his personal and professional environments. He has become socially withdrawn, avoiding people, places and other social activities that he used to take pleasure in participating. He cannot sleep through the night due to stress and worry. * * *

It is therefore my recommendation that Mr. McCollum not return to work in any capacity at this point in time as a law enforcement representative. Please refer to the reasons above and the primary diagnosis as my reasons for rendering my decision. It is also my professional opinion that he has endured over time emotional trauma and to put him back into the same work environment as a police officer would be detrimental to both him and the people with whom he works and the society he has been entrusted to protect.

It is my recommendation that Mr. McCollum seek a mental health physician and/or psychologist to embark on a strict counseling regimen to begin immediately. It is my recommendation that he be evaluated once again in one year to determine his mental health status at that time.

**Opinion:** If Mr. McCollum feels that he cannot serve his community as a protector and leader due to the ongoing stress of the job, it is my professional opinion that he take a leave of absence immediately. If his insecurity due to the rigors of his job in anyway effects his performance while on duty it could be to the detriment of himself, a fellow officer or civilian, even resulting in a death that could have otherwise been avoided had he been wholly invested in his role as a police officer.

{¶ 13} 3. The record also contains a copy of the May 5, 2016 discharge report from Northside Medical Center.  Appended to the discharge report are multiple documents

relating to relator's emergency department visit. Under "History of Present Illness," one of the documents states:

> The patient presents with 42-year-old male with no past medical history coming in for dull chest pain that appears to be stress induced; took sleeping pills (diphenhydramine) last night which brought on symptoms. After further investigation chest pain is clearly stress-induced because of possible job termination, works as a police officer – currently facing disciplinary action. No allergies to medicine, taking Allegra for rag-weed allergy. No significant past medical history, surgical history or family history. Non smoker. The onset was 2 hours ago. The course duration of symptoms is improving. Location: anterior. Radiating pain: none. The character of symptoms is dull. The degree at onset was minimal. The degree at maximum was minimal. The degree at present is none. The exacerbating factor is Stress/Anxiety. Risk factors consist of none. Prior episodes: none. Therapy today None. Associated symptoms: anxiety, denies shortness of breath, denies nausea, denies vomiting, denies diaphoresis and denies palpitations.

{¶ 14} 4. On June 20, 2016, OP&F received relator's disability benefit application.

{¶ 15} 5. On June 27, 2016, Dr. Nalluri completed an OP&F form captioned "**Report of Medical Evaluation**, by Member's attending physician." On the form, Dr. Nalluri indicated by marking a box aside a preprinted statement:

> The member has a ***condition of disability from which there is no present indication of recovery*** using the occupational characteristics developed by the U.S. Department of Labor for the positions of police officer – government service or fire fighter any industry.

(Emphasis sic.)

{¶ 16} 6. Earlier, by letter dated May 5, 2016, Eric Merkle, Chief of Police of the city of Warren, informed relator that he is terminated from the Warren Police Department, effective immediately.

{¶ 17} The Merkle letter explains:

> Ref: Disciplinary Action
>
> On December 23, 2015, a public complaint was filed in my office by Jimmie White alleging excessive force during his arrest on May 25, 2015. Pursuant to the Public Complaint

Policy 07-001, this matter was investigated by the Internal Affairs Division. * * *

That investigation revealed the following: On Monday, May 25, 2015 at approximately 1400 hours, you responded to 596 Atlantic St. NE * * * for a disturbance call. While at the scene, you witnessed a use of force as defined in the Warren Police Department Use of Force Policy #96-007. Further, the arrested subject made several allegations of an objectively unreasonable use of force (arm broken during arrest) to you mandating that you notify your immediate supervisor upon receipt of the allegation.

You failed to complete a Level One Report with regards to the force used by Officer Chris Martin and witnessed by you.

You failed to notify your immediate supervisor upon receipt of the allegations of objectively unreasonable force.

Additionally, the investigation demonstrates that you were not truthful during the investigation of this incident.

* * *

A pre-disciplinary hearing was scheduled for Wednesday, May 4, 2016 at 1:00 p.m. I was advised via email by Attorney Randall Weltman of the O.P.B.A. that you elected to waive that hearing.

After considering all of the facts concerning the alleged violations of the Policies and/or Procedures of the Warren Police Department, I find that the charges set forth in the "Departmental Charges" letter dated May 2, 2016 are true, and you should be disciplined for just cause.

* * *

You are hereby **terminated** from the Warren Police Department, effective immediately. Please be aware of your rights as they relate to the current O.P.B.A. Collective Bargaining Agreement with the City of Warren.

(Emphasis sic.)

{¶ 18} 7. On July 22, 2016, an arbitrator of the U.S. Federal Mediation & Conciliation Service heard the matter of relator's discharge.  On October 20, 2016, the arbitrator issued his award:

> The grievance is sustained in part. The Grievant's discharge shall be converted to a suspension of thirty days without pay, and he shall be reinstated and made whole for any losses following the completion of the suspension.

{¶ 19} The arbitrator's 15-page report concludes:

> Based on the entire record, it is concluded that there was not just cause to discharge the Grievant. However, there was just cause to suspend him for thirty days for his failure to file a report over the use of force during White's arrest, his failure to advise his supervisor of White's complaint of injury, and his misstatements of that incident without fully investigating the accuracy of his recollection of the incident.
>
> Based on all of the foregoing the grievance will be sustained in part, and the Grievant shall be reinstated and made whole following a thirty-day suspension beginning on May 5, 2016.

{¶ 20} 8.  Earlier, on May 9, 2016, at relator's request, he was examined by Robert E. Bisel, D.O.  In his four-page narrative report, Dr. Bisel states:

> This 42 year old male presents for stress/anxiety.
>
> **History of Present Illness:**
>
> [One] stress/anxiety
> Jason stated that he has been under a lot of stress regarding the loss of his job. He stated that he has been fired from the police force for what he feels are unjust accusations. He is dealing with his union representative and scheduling an arbitration hearing. He has been very stressed since that time. The patient states that since the issues started to occur at his place of employment that he has been having difficulty initiating and maintaining sleep. He has tried Sominex in an attempt to sleep but found that he developed palpitations and it did not help in him being able to fall asleep any easier or maintain sleep. The patient was seen and evaluated in the Northside Emergency Department for anxiety. He was prescribed on Klonopin. He does not feel[] as this has really helped with his anxiety. The patient states that his appetite is poor to fair at times and he has lost 7 pounds unintentionally.

> Jason states that he is to see Dr. Dellurio (?) for psychiatric counseling.

{¶ 21} 9. On September 21, 2016, at the request of relator's counsel, William D. Diorio, Ph.D., KISW-S, a licensed independent social worker-supervisor, issued a ten-page narrative report:

> Jason McCollum was seen for an initial assessment and session of cognitive psychotherapy on May 10, 2016. Thereafter, Mr. McCollum has been provided with individual cognitive psychotherapy at a frequency of one session every two-three weeks.
>
> * * *
>
> While Mr. McCollum continues to benefit from cognitive psychotherapy, it is my clinical opinion that he is totally mentally impaired and unable to return to any form of active duty as a law enforcement officer with the Warren Police Department or any law enforcement agency, with or without accommodations for his mental disabilities for a continuous period of twelve months, *at least.*

(Emphasis sic.)

{¶ 22} 10. On October 6, 2016, at the request of OP&F, relator was interviewed and evaluated by forensic psychologist, Lynn A. Luna-Jones, Ph.D. In her ten-page narrative report, Dr. Luna-Jones states:

> **INTRODUCTION:**
>
> Mr. McCollum reported that he was employed by Warren Police Department from 2002 to 2016. He said that during his employment, he had three significant disciplinary actions, all during the past five years. He indicated the first incident for use of force and occurred while transporting a prisoner to the jail. While the prisoner exited the cruiser, he fell "dead weight" and fell on the steps. Mr. McCollum said his "Chief felt I should have taken care of the prisoner better." He noted, "I took it very hard" because "I felt that I wasn't wrong... I felt I'm an outstanding employee," yet "I'm being punished."
>
> Mr. McCollum said the second incident occurred in 2015 for improper use of Ohio Law Enforcement Gateway (OLEG). He indicated that after receiving his password to access that database, he and his wife looked up her, their family

members, and her employer. He said that he did not realize that he was not allowed to do so because he did not receive sufficient training on OLEG.

* * *

Mr. McCollum said he thought "it was a personal vendetta" against him. He was very upset that his situation was "on the news" and the stress of it ruined our vacation" that year. [sic]

Mr. McCollum said that his third disciplinary action was related to use of force. A suspect was arrested in May of 2015 by Mr. McCollum and another officer, and Mr. McCollum transported him to the jail. As Mr. McCollum was leaving the jail, the suspect informed him that his arm was broken during the arrest. He told him to discuss it with the nurse and left. During an investigation in December of 2015, Mr. McCollum denied that there was any use of force. It was felt that "I was being untruthful" so he was fired.

* * * When asked I he would still be working as a police officer if he were not fired, Mr. McCollum replied, "I probably would have still been working." However, he quickly added he would likely not be working at his best due to his psychological problems.

Mr. McCollum reported that he began experiencing panic attacks in May of 2016. He estimated that he has had six total, but they have gotten better. * * *

When asked if he felt depressed, Mr. McCollum replied, "No." He said he isolates himself from others at times, but is not frequently tearful or sad. He described his energy level as "up and down," but denied experiencing chronic fatigue. He added, "If I can stay busy, I'm good... but I have moments where I get lazy and do nothing." Mr. McCollum said his sleep is "bad" since "this horrible mess" in 2016. * * *

With regard to mental health treatment, Mr. McCollum said that he began receiving outpatient psychotherapy with Dr. Diorio in May of 2016. He indicated that they have sessions once per week. Mr. McCollum reported that he began taking psychotropic medication around the same time, as prescribed by his primary care physician, Dr. Bisel. He said he is prescribed Xanax for anxiety and Ambien to sleep.

* * *

## MENTAL STATUS EXAMINATION:

Mr. McCollum is a 43-year-old Caucasian male. He [came] to this appointment accompanied by his wife. Mr. McCollum had brown hair and wore a thick beard. He is five feet, 9 inches tall and weighs 195 pounds. His blood pressure was 128-84. He was casually dressed for this interview and he wore a baseball hat.

Mr. McCollum's hygiene and grooming were good. He provided information in a clear and coherent manner and he made appropriate eye contact. Mr. McCollum was cooperative with this evaluation, as he answered all questions posed to him and had no difficulty providing personal information.

Mr. McCollum's thought processes were logical and goal-directed. He denied experiencing any hallucinations or delusions, and no evidence of psychosis was noted during this evaluation. He did not display any overt signs of mania, including an abnormally elevated or irritable mood, grandiosity, increased talkativeness, or racing thoughts. Further, he denied current suicidal and homicidal ideation. He identified his mood as "good today."

Mr. McCollum was orientated to person, place, and date. His recent and remote memory were intact as demonstrated by his ability to recall recent and past personal information with ease. Mr. McCollum displayed no difficulties with immediate recall, but he could only recall two of three words after a delay. His attention and concentration were adequate, and he was able to spell "WORLD" backwards and perform Serial 7 subtractions. Mr. McCollum was able to sustain attention without difficulty throughout this interview and psychological testing. His insight was fair and he appeared to be functioning in the average range of intelligence.

Overall, results of the Folstein Mini-Mental State Exam indicated normal functioning (Total score 29 out of 30) in the areas of orientation, immediate recall, attention and calculation, recall, and language.

\* \* \*

## DIAGNOSIS:

**[One] Adjustment Disorder with Anxiety (309.24)**

**FUNCTIONAL ASSESSMENT:**

Based solely on psychological factors, Mr. McCollum displays no deficits in self-care and personal hygiene; social and recreational activities; travel; social functioning; or concentration, persistence, and pace. However, he appears to have mild impairment in adaptation. This results in a Psychiatrist Impairment Rating Scale impairment score of Class 1, 0%.

According to the Brief Psychiatrist Rating Scale, Mr. McCollum would obtain a summed score of 40, for a 10% impairment score.

Mr. McCollum's GAF score would be rated at 75, as his anxiety is a transient and expectable reaction to his stressors. This would result in a GAF impairment score of 0%.

Based on these impairment ratings, Mr. McCollum would have a whole person impairment rating of 0%.

**DISCUSSION AND OPINION:**

In response to the specific referral questions, the following opinions are offered:

*Was the alleged disability a direct result of their employment or was it already present when they were hired? Or did the alleged psychological disability develop after employment, but for reasons unrelated to work? Did their police or fire service induce or aggravate a pre-existing or concurrently developing psychiatric condition?*

Based on all the information provided, Mr. McCollum was functioning very well from a psychological perspective until he began receiving disciplinary actions at work around 2011. He continues to feel that he either did nothing wrong or blames others for his rule violations. He is angry about being fired and worried about his future. Although at times during this evaluation he attempted to attribute his level of stress to traumatic events that he witnessed at work, it does not appear that he developed any particular posttraumatic stress related to those events. It does not appear that he developed any significant stress until he began worrying about being fired.

> Since his termination, Mr. McCollum has reportedly been worried and somewhat concerned about the motivations of others, believing that they have singled him out and treated him unfairly. His concerns are reportedly causing him sleep disturbance. This adjustment disorder with anxiety developed after his employment, for reasons unrelated to his work, rather his termination from work. His police service did not induce or aggravate a pre-existing or concurrently developing psychiatric condition.

(Emphasis sic.)

{¶ 23} 11. On October 7, 2016, Dr. Luna-Jones completed a four-page OP&F form captioned "Medical Evaluation by OP&F Psychiatrist."

{¶ 24} Under section II of the form captioned "Evaluation," the OP&F psychiatrist is given the following instruction:

> Attach a complete report of findings and narrative comments pertinent to your specialty. Express each impairment in terms of percent impairment of the whole person referencing *AMA Guides.*

(Emphasis sic.)

{¶ 25} Below the instruction, under Axis I, Dr. Luna-Jones wrote "Adjustment Disorder [with] Anxiety."

{¶ 26} Also below the instruction, under Impairment Score, Dr. Luna-Jones wrote: "BPRS 10%."

{¶ 27} At section II, aside the request for the "Final Estimated Whole-Person Impairment," Dr. Luna-Jones wrote "0%" in the space provided.

{¶ 28} The OP&F form requests that the examining psychiatrist provide a "Physician's Disability Opinion" by marking a box aside a preprinted disability statement. On the form, Dr. Luna-Jones marked the box aside the following preprinted statement:

> The member is **not incapacitated** for the performance of duties using the occupational characteristics developed by the U.S. Department of Labor for the positions of police officer – government service or fire fighter – any industry.

(Emphasis sic.)

{¶ 29} 12. Ohio Adm.Code 742-3-05(A)(13) provides for a "[d]isability evaluation panel (DEP)."  Therein, the DEP "shall mean that panel established by the board to make written recommendations to the board on pending disability applications."

{¶ 30} 13. OP&F requested that John W. Cunningham, M.D., a DEP physician member, review and evaluate the reports of Dr. Luna-Jones.  In response, on November 21, 2016, Dr. Cunningham wrote:

> This 43-year-old Warren police officer with more than 20 years service was evaluated for the Fund by Dr. Luna Jones, who is a psychologist, for adjustment disorder with anxiety, for which this member is taking Xanax for anxiety and Ambien to sleep. This individual did not begin receiving outpatient psychotherapy until 2016, when he had weekly visits with the psychologic professional. The medications were prescribed were by his primary care physician.
>
> According to the member's application, he was involuntarily separated from employment on 05/31/16. Dr. Jones stated that all of this individual's adjustment categories were in the "very good" and/or "good" categories, with only four of the adjustment categories being "good", with the remaining thirteen adjustment categories being in the "very good" category. The BPRS was 10%, the PIRS was 0%, the GAF was 0%, the negative impression management was 55%, and the malingering index was 44%.
>
> Dr. Jones concluded, "Based on all the information provided, Mr. McCollum was functioning very well from a psychological perspective until he began receiving disciplinary actions at work around 2011. He continues to feel that he either did nothing wrong or blames others for his rule violations. He is angry about being fired and worried about his future." Consequently, this individual has no disabling conditions. His psychiatric impairment is 0%, it is not waiverable and is not work related, and he is not incapacitated from working as a police officer on the basis of his psychiatric difficulties.

{¶ 31} 14. On November 21, 2016, Dr. Cunningham completed a two-page OP&F form captioned "Disability Evaluation Panel Recommendation."  On the form, Dr. Cunningham found a zero percent psychiatric impairment.

{¶ 32} Also, Dr. Cunningham marked the box aside the following preprinted statement:

> The member is **not permanently incapacitated** for the performance of duties using the occupational characteristics developed by the U.S. Department of Labor for the positions of police officer – government service or fire fighter – any industry.

(Emphasis sic.)

{¶ 33} 15. Earlier, on October 21, 2018, at the request of OP&F, relator was interviewed by vocational evaluator, Paul T. Kijewski, CRC, LPC, CDMS. In his six-page narrative report dated October 30, 2016, Kijewski opined:

> In summary, I must conclude that it is unclear as to whether or not Mr. McCollum is not is able [sic] to perform the duties of a Police Officer at the present time because of his current emotional difficulties due to the difference of opinion between Dr. Nalluri who states Mr. McCollum has a condition of disability from which there is no present indication of recovery based on the characteristics developed by the U.S. Department of Labor for that position and Dr. Luna-Jones who finds that Mr. McCollum is not incapacitated from performing the duties of a Police Officer based on the characteristics developed by the U.S. Department of Labor for that position. He does have some limited transferable skills and vocational options. All of these jobs have wages levels considerably lower than the $52,000 per year Mr. McCollum earned as a Police Officer with the Warren Police Department.

{¶ 34} 16. On November 29, 2016, at the request of OP&F, vocational consultant W. Bruce Walsh, Ph.D., reviewed the medical and vocational reports of record. In his two-page narrative report, Dr. Walsh opined:

> <u>Summary:</u> A psychiatric report by Dr. Nalluri indicates that Mr. McCollum suffers from post traumatic stress disorder, a generalized anxiety disorder, and a major depressive disorder and needs to take a leave of absence immediately. In his opinion Mr. McCollum suffers from fatigue and poor concentration. The psychological examination by Dr. Jones notes that Mr. McCollum is not incapacitated based on the adjustment disorder with anxiety and cites a GAF of 75, suggesting slight impairment in social and occupational functioning. She indicates that Mr. McCollum has very good ability to make performance adjustments and good to very good ability to make occupational and personal social adjustments. The vocational evaluation by Mr. Kijewski opines that based on the mental impairments and limitations

cited by Dr. Jones, Mr. McCollum is not incapacitated and retains the ability to perform past relevant work as a police officer. However, Dr. Nalluri has a different opinion, suggesting the need for a leave of absence immediately based on his mental impairments. In summary, the mental and vocational limitations suggest that Mr. McCollum is not incapacitated and retains the ability to perform past relevant work as a police officer. This assessment is consistent with evidence reported by Dr. Jones. However, Dr. Nalluri has a different opinion, suggesting the need for an immediate leave of absence. Further discussion by the panel is appropriate. An estimate of earning capacity loss is deferred at this time.

{¶ 35} 17. On December 13, 2016, Dr. Walsh completed a one-page OP&F form captioned "Vocational Recommendation, for Disability Evaluation Panel Hearing." Following oral discussion at the DEP meeting, Dr. Walsh wrote "Not Incapacitated" in the space provided for a determination.

{¶ 36} 18. Earlier, by letter dated November 2, 2016, from OP&F case manager Megan Pawloski, relator was informed that his disability benefit application was scheduled tentatively to be heard by DEP during its December 14, 2016 meeting.

{¶ 37} 19. On December 13, 2016, "Disability Committee Chair," Daniel Desmond signed a one sentence memorandum, stating:

> Based on the accompanying Disability Evaluation Panel & Vocational Recommendations, the Disability Committee recommends that this member's disability application be denied.

{¶ 38} 20. By letter dated December 14, 2016, OP&F member services director, Jennifer Harville, informed relator:

> At its recent meeting, the Board of Trustees of the Ohio Police & Fire Pension Fund (OP&F) reviewed your application for disability benefits. I write to inform you of the Board's decision.
>
> **BOARD ACTION:** By action of the Board of Trustees, your application for disability benefits was disapproved. In reaching its decision, the Board relied upon the entire record which includes our personal history file and medical evidence obtained in conjunction with your application for disability benefits. Based upon the medical evidence, and considering

your training, experience and accomplishments, the Board finds that you are not disabled.

**RIGHT TO APPEAL:** If you are dissatisfied with the Board's decision, you may appeal by filing a written notice of appeal with OP&F in the form provided by OP&F within ninety (90) days from the date you receive this letter.

(Emphasis sic.)

{¶ 39} 21. On January 13, 2017, relator filed an appeal on an OP&F form captioned "Notice of Disability Appeal." The form instructs: "Within 60 days of filing this Notice of Appeal, you must file with OP&F all documents that you desire to submit in support of your appeal."

{¶ 40} 22. Earlier, on December 21, 2016, at relator's request, Dr. Bisel issued another report. Dr. Bisel states:

This 43 year old male presents for Anxiety and insomnia.

**History of Present Illness:**

[One] Anxiety.

Jason stated that he continues to have a lot of stress. He has been seen by a vocational counselor and psychologist. He states that he was denied for the first pension board. He has been very stressed since that time and it is affecting his ability to sleep as well. He uses Ambien cautiously for sleep-not night [sic] but states that he does not feel rested upon awakening. He is taking Xanax only when he is very anxious which helps a little-he has weaned downed [sic] to once or twice a week.

[Two] Insomnia.

The patient presents for insomnia. The symptoms are unchanged. The patient's symptoms began suddenly and have continued. These complaints are continual. The patient has the following risk factors for insomnia: age>40 years and use of alcohol. The insomnia is worsened by stress. He does take Ambien cautiously but states that he does not feel rested after taking it. The patient is experiencing depression, difficulty concentrating, difficulty initiating sleep, difficulty maintaining sleep and increased fatigue-these symptoms are slightly improved since last visit. The patient denies awakening with choking or wheezing. Additional information:

States that since having issues at former work place he has continued to have difficulty sleeping. Has issue with both depression and anxiety though feels they are slightly better.

{¶ 41} 23. On December 26, 2016, relator was again examined by Dr. Nalluri. In her eight-page narrative report, Dr. Nalluri concluded:

I want to reiterate what I wrote in my initial report. It is my opinion after speaking with Mr. McCollum during my current examination on December 26, 2016 that the above diagnoses are correct and for which he meets all criteria, according to the DSM 5.

When trying to make a diagnosis, I take into consideration a variety of symptoms that point to the underlying issue(s). In Mr. McCollum's case, many of the changes he has been experiencing has deviated greatly from the norm most prominently over the last few months and possibly even the last few years, but it has most certainly come to a point where he needed to find help from a mental health practitioner, for which he now is receiving.

His symptoms are to the point that they are interfering with his activities of daily living in both his personal and professional environments. He has become socially withdrawn, avoiding people, places and other social activities that he used to take pleasure in participating.

Since our first encounter in May, Mr. McCollum continues to have sleepless nights due to stress and worry about having to return to a work environment where he felt alone and distrusting of a system that he devoted the last 20 years to serving.

As I have stated it is my recommendation that Mr. McCollum not return to work in any capacity as a law enforcement representative with the Warren Police Department.

It is my recommendation that Mr. McCollum continue his mental health counseling sessions with William Diorio Ph.D.

{¶ 42} 24. On January 15, 2017, at relator's request, Dr. Diorio issued another report. Consisting of nine-pages, the report criticizes the October 6, 2016 report of Dr. Luna-Jones.

{¶ 43} 25. On February 9, 2017, at the request of OP&F, Dr. Luna-Jones issued a four-page addendum to her October 6, 2016 report.  In her addendum report, Dr. Luna-Jones reviewed the May 9, 2016 and December 21, 2016 reports of Dr. Bisel, the December 26, 2016 report of Dr. Nalluri and the September 21, 2016 and January 15, 2017 reports of Dr. Diorio.  Dr. Luna-Jones opined:

> Based on all the information provided, Mr. McCollum was functioning very well from a psychological persepective [sic] until he began receiving disciplinary actions at work around 2011. He continues to feel that he either did nothing wrong or blames others for his rule violations. He is angry about being fired and worried about his future. Although at times during his October 6, 2016 evaluation he attempted to attribute his level of stress to traumatic events that he witnessed at work, it does not appear that he developed any particular posttraumatic stress related to those events. It does not appear that he developed any significant stress until he began worrying about being fired.
>
> Since his termination, Mr. McCollum has reportedly been worried and somewhat concerned about the motivations of others, believing that they have singled him out and treated him unfairly. His concerns are reportedly causing him sleep disturbance. This adjustment disorder with anxiety developed after his employment, for reasons unrelated to his work, rather his termination from work. His police service did not induce or aggravate a pre-existing or concurrently developing psychiatric condition.
>
> Upon review of the additional medical evidence from Drs. Bisel, Nalluri, and Diorio, the aforementioned opinion remains unchanged. Indeed, it is my opinion that Mr. McCollum does not meet the full criteria for posttraumatic stress disorder, generalized anxiety disorder, or major depressive disorder. His most consistent reported symptoms are anxiety and insomnia, which I believe are most effectively captured in a diagnosis of adjustment disorder with anxiety.

{¶ 44} 26. On March 6, 2017, at the request of OP&F, vocational evaluator Kijewski issued a five-page addendum to his October 30, 2016 report.  In his addendum, Kijewski concludes:

> In my original report, I concluded that it was unclear as to whether or not Mr. McCollum was able to perform the duties

of a Police Officer at that time due to his emotional difficulties. That conclusion stands.

In my original I stated that based on Dr. Luna-Jones' report, it appeared that Mr. McCollum is capable of performing near 100% of unskilled occupations that fall in the sedentary, light, medium and heavy range of physical demands based on any, limitations due to Mr. McCollum's emotional difficulties. The report of Dr. Nalluri did not contain sufficient information to estimate percentages of unskilled occupations that Mr. McCollum could perform considering any mental limitations. As there was no medical information reviewed that mentioned any physical restrictions, the percentage of unskilled occupations that Mr. McCollum could perform based on any physical limitations cannot be estimated. The report of Dr. Nalluri, the letter of Dr. Deorio and the notes from Dr. Bisel did not specifically include estimates of Mr. McCollum's level of functioning in regards to Occupational Adjustments, Performance Adjustments and Personal & Social Adjustments. Therefore, that conclusion stands.

In my original report, I concluded that the skills which Mr. McCollum has acquired, transferred into the occupations of Customer Service Representative, Dispatcher for private security and alarm companies, Information Clerk and Courier. That conclusion stands.

{¶ 45} 27. On June 27, 2017, OP&F medical advisor, Gregory Jewell, M.D., completed an OP&F form captioned "Medical Recommendation For Appeal Hearings." On the form, at section II, Dr. Jewell states:

**The following diagnoses and whole person impairment percentage was made by the DEP physician on November 21, 2016 at the initial determination hearing:**

Percentage of Whole Person Impairment (Combined Value) 0%

(Emphasis sic.)

{¶ 46} On the form, at section III, Dr. Jewel wrote that the "psychiatric" diagnosis is zero percent impairment. He remarked "No Disability Conditions Reasonably Supported." Dr. Jewell marked the box aside the following preprinted statement:

> The member **is not permanently incapacitated** for the performance of duties using the occupational characteristics developed by the U.S. Department of Labor for the positions of police officer – government service or fire fighter – any industry.

(Emphasis sic.)

{¶ 47} 28. On June 27, 2017, OP&F vocational consultant, Bruce S. Growick, Ph.D., completed an OP&F form captioned "Vocational Recommendation For Appeal Hearing." On the form, Dr. Growick wrote in his own hand "mild wage loss."

{¶ 48} 29. On June 27, 2017, the board heard relator's appeal.

{¶ 49} 30. On June 27, 2017, board chair, Jeffrey H. Moore, signed an OP&F form captioned "Findings of Fact on Disability Appeal." On the form, in the space provided, the board explains:

> After review of all evidence noted in the *Medical Recommendation for Appeal Hearings* of Dr. Jewell, dated June 27, 2017, the *Vocational Recommendation for Appeal Hearing* of Dr. Growick, dated June 27, 2017, and the additional evidence presented at the appeal hearing the Board finds that Mr. McCollum's appeal of his initial disability application be denied.

(Emphasis sic.)

{¶ 50} 31. On July 26, 2017, relator, Jason R. McCollum, filed this mandamus action.

Conclusions of Law:

{¶ 51} It is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.

### The Pertinent Statute

{¶ 52} R.C. 742.38(C) provides:

> (C) For purposes of determining under division (D) of this section whether a member of the fund is disabled, the board shall adopt rules establishing objective criteria under which the board shall make the determination. The rules shall include standards that provide for all of the following:
>
> (1) Evaluating a member's illness or injury on which an application for disability benefits is based;

**(2)** Defining the occupational duties of a police officer or firefighter;

**(3)** Providing for the board to assign competent and disinterested physicians and vocational evaluators to conduct examinations of a member;

**(4)** Requiring a written report for each disability application that includes a summary of findings, medical opinions, including an opinion on whether the illness or injury upon which the member's application for disability benefits is based was caused or induced by the actual performance of the member's official duties, and any recommendations or comments based on the medical opinions;

**(5)** Providing for the board to consider the member's potential for retraining or reemployment.

**{¶ 53}** R.C. 742.38(D) provides:

As used in this division: "Totally disabled" means a member of the fund is unable to perform the duties of any gainful occupation for which the member is reasonably fitted by training, experience, and accomplishments. Absolute helplessness is not a prerequisite of being totally disabled.

"Permanently disabled" means a condition of disability from which there is no present indication of recovery.

\* \* \*

**(1)** A member of the fund who is permanently and totally disabled as the result of the performance of the member's official duties as a member of a police or fire department shall be paid annual disability benefits in accordance with division (A) of section 742.39of the Revised Code. In determining whether a member of the fund is permanently and totally disabled, the board shall consider standards adopted under division (C) of this section applicable to the determination.

**(2)** A member of the fund who is permanently and partially disabled as the result of the performance of the member's official duties as a member of a police or fire department shall, if the disability prevents the member from performing those duties and impairs the member's earning capacity, receive annual disability benefits in accordance with division (B) of section 742.39of the Revised Code. In determining whether a

member of the fund is permanently and partially disabled, the board shall consider standards adopted under division (C) of this section applicable to the determination.

### Pertinent Regulations Promulgated by the Board

{¶ 54} Currently, Ohio Adm.Code 742-3-05(A) provides:

(A) For purposes of * * * section 742.38of the Revised Code and this rule, the following terms shall have the meanings set forth herein:

(1) "Board," shall mean the board of trustees of the Ohio police and fire pension fund ("OP&F").

(2) "Applicant" shall mean a member of OP&F who has filed any type of application for disability retirement benefits * * *

(4) "On-duty illness or injury" means an illness or injury that occurred during or resulted from the performance of official duties under the direct supervision of a member's appointing authority.

(5) "Off-duty illness or injury" means an illness or injury that did not occur during or result from the performance of official duties under the direct supervision of a member's appointing authority. * * *

(11) "Medical Advisor," as referred to in this rule, shall mean the expert physician appointed by OP&F's board of trustees who advises the board during its deliberations of appeals of decisions relating to disability applications.

(12) "Vocational Expert," as referred to in this rule, shall mean the expert in vocational evaluations appointed by OP&F's board of trustees who advises the board during its deliberations of appeals of decisions relating to disability applications.

(13) "Disability evaluation panel (DEP)" shall mean that panel established by the board to make written recommendations to the board on pending disability applications. The DEP shall be comprised of three voting members and at least two non-voting members. * * * The non-voting members of the DEP shall be comprised of expert physicians, including the alternate, all of whom are appointed by the board of trustees and at least one of the non-voting members shall be an expert in vocational evaluations, including the alternate, who shall

provide vocational assessments of disability applicants to the DEP. * * *

(14) "DEP medical advisor," as referred to in this rule, shall mean the expert physician appointed by the board of trustees to advise the DEP during its deliberations of initial disability applications and post-retirement disability reconsiderations, who shall be a different physician than the medical advisor.

(15) "DEP vocational expert," as referred to in this rule, shall mean the expert in vocational evaluations appointed by the board of trustees to advise the DEP during its deliberations of initial disability applications and post-retirement disability reconsiderations, who shall be a different evaluator than the vocational expert.

* * *

(C) Initial application.

(1) Applications for disability benefits shall be made on the disability application form approved by the board and must be in proper form in order to be processed. * * *

(5) OP&F shall schedule the member covered by the pending disability benefit application for examination by at least one medical examiner and one expert in vocational evaluations designated by OP&F, unless it is medically inadvisable to do so.

* * *

(6) When all the necessary medical reports and records have been received by OP&F, including those reports required or requested under paragraphs (C)(3) and (C)(4) of this rule, OP&F shall schedule such application for review and consideration by the DEP, who shall make a written recommendation to the board based upon the criteria set forth in paragraph (B) of this rule. The board, based on the written recommendation of the DEP, will then consider the application and make an initial determination of disability.

{¶ 55} Currently, Ohio Adm.Code 742-3-05(E) provides:

(E) Appeal of initial determination. * * *

(4) Depending on the basis for the appeal and the new evidence submitted by the member, OP&F may request that the member undergo a new medical examination and/or vocational evaluation by an OP&F appointed examining physician and/or vocational evaluator. OP&F may also provide the new evidence to the original OP&F appointed examining physician and/or vocational evaluator and request that they review the new evidence and provide OP&F with an addendum to their original reports. The new evidence submitted by the member and any additional medical and/or vocational reports, including addendum reports, shall be forwarded to the board's medical advisor and vocational expert for review and consideration. The medical advisor and vocational expert will then provide recommendations to the board regarding the member's disability application.

(5) Upon receipt of the recommendations from the medical advisor and vocational expert, the board shall schedule a hearing on the appeal * * * The appellant shall be given the opportunity to be present, with counsel or other representation if he or she chooses, at the hearing.

### Basic Law

{¶ 56} Public employee pension systems and their boards have no duty to state the basis for their decision denying disability benefits when no statute or duly adopted administrative rule requires it. *State ex rel. Tindira v. Ohio Police & Fire Pension Fund,* 130 Ohio St.3d 62, 2011-Ohio-4677, ¶ 30, citing *State ex rel. Pipoly v. State Teachers Retirement Sys.,* 95 Ohio St.3d 327, 2002-Ohio-2219. However, the final decision of the board must be supported by some evidence in the record. *State ex rel. Marmaduke v. Ohio Police & Fire Pension Fund,* 147 Ohio St.3d 390, 2016-Ohio-5550, ¶ 17.

{¶ 57} To be entitled to a writ of mandamus, relator must establish a clear legal right to the requested relief, a clear legal duty on the part of respondent to provide it, and the lack of an adequate remedy in the ordinary course of the law. *Id.* at ¶ 15, citing *State ex rel. Waters v. Spaeth,* 131 Ohio St.3d 55, 2012-Ohio-69. Moreover, in mandamus, the relator must prove that he is entitled to the writ by clear and convincing evidence. *Marmaduke,* ¶ 15.

### Analysis

{¶ 58} Following the filing of his application for a disability benefit in June 2016, OP&F scheduled relator for an examination to be performed by psychologist Dr. Luna-

Jones. Dr. Luna-Jones was scheduled to examine relator pursuant to Ohio Adm.Code 742-3-05(C)(5). Following an October 6, 2016 examination, Dr. Luna-Jones issued a ten-page narrative report. On October 7, 2016, Dr. Luna-Jones completed a four-page OP&F form captioned "Medical Evaluation by OP&F Psychiatrist." On the form, at section II, aside the request for the "Final Estimated Whole-Person Impairment," Dr. Luna-Jones wrote "0%" in the space provided.

{¶ 59} OP&F requested that Dr. Cunningham review and evaluate the reports of Dr. Luna-Jones. In response, on November 21, 2016, Dr. Cunningham wrote

> [T]his individual has no disabling conditions. His psychiatric impairment is 0%, it is not waiverable and is not work related, and he is not incapacitated from working as a police officer on the basis of his psychiatric difficulties.

{¶ 60} On November 21, 2016, Dr. Cunningham completed a two-page OP&F form captioned "Disability Evaluation Panel Recommendation." On the form, Dr. Cunningham found a zero percent psychiatric impairment.

{¶ 61} Following relator's appeal, Dr. Jewel completed on June 27, 2017 an OP&F form captioned "Medical Recommendation For Appeal Hearings." On the form, Dr. Jewell wrote that the "psychiatric" diagnosis is zero percent impairment. He remarked "No Disabling Conditions Reasonably Supported."

{¶ 62} At section II of the form, Dr. Jewel stated:

> **The following diagnoses and whole person impairment percentage was made by the DEP physician on November 21, 2016 at the initial determination hearing:**
>
> Percentage of Whole Person Impairment (Combined Value) 0%

(Emphasis sic.)

{¶ 63} It is clear from the record that Dr. Jewell's reference to the November 21, 2016 DEP Physician is a reference to the November 21, 2016 reports of Dr. Cunningham.

{¶ 64} Thus, it can be said that Dr. Jewell relied on the two reports from Dr. Cunningham in concluding that relator has zero percent psychiatric impairment. Because Dr. Cunningham was asked to review the October 6, 2016 and October 7, 2016

reports of Dr. Luna-Jones, it can be said that, by implication, Dr. Jewell relied on the reports of Dr. Luna-Jones that Dr. Cunningham reviewed and evaluated in his reports.

{¶ 65} As earlier indicated, the June 27, 2017 findings of the board state reliance on Dr. Jewell's June 27, 2017 "Medical Recommendation For Appeal Hearings." Thus, it can be said that the board's June 27, 2017 decision is premised on the reports of Dr. Luna-Jones and the reports of Dr. Cunningham.

{¶ 66} Given the above analysis, the issue is whether the June 27, 2017 report of Dr. Jewell is some evidence on which the board can rely in finding that relator has a zero percent whole person impairment related to his alleged psychiatric conditions. The magistrate finds that the June 27, 2017 report of Dr. Jewell provides some evidence on which the board relied in denying the application for a disability benefit.

### Relator's Arguments

{¶ 67} In his brief, relator presents the following argument:

#### Dr. Anil Nalluri

On May 4, 2016 Jason McCollum met with [] Anil Nalluri M.D. Dr. Nalluri performed an initial evaluation and diagnosed Mr. McCollum with Posttraumatic Stress Disorder, Generalized Anxiety Disorder, and Major Depressive Disorder. It was Dr. Nalluri's opinion that Mr. McCollum was not to return to work in any capacity as a law enforcement representative and to continue counseling.

#### Dr. William Diorio

Upon the recommendation of Dr. Nalluri, Mr. McCollum sought the treatment of William Diorio, PHD. Dr. Diorio also diagnosed Mr. McCollum with Generalized Anxiety Disorder, Posttraumatic Stress Disorder, and Major Depression Disorder. It was likewise Dr. Diorio's opinion that he is totally mentally impaired and unable to return to any form of active duty in law enforcement.

#### Dr. Lynn Luna

Subsequent to filing his application for benefits, Ohio Police and Fire referred Jason McCollum for an independent medical investigation. While Dr.'s Nalluri and Diorio treated Mr. McCollum for several months for the conditions they diagnosed, Dr. Luna saw Mr. McCollum for about two (2)

> hours. In this short time she determined that the opinions of Jason McCollum's two treating physicians was wrong and the Jason McCollum did not experience anxiety or any psychiatric condition related to his police work.
>
> Ohio Police and Fire ignored the opinion of the only medical doctor who examined McCollum. Instead they relied on the opinion of their paid evaluator, Dr. Luna. As argued before the board, Dr. Luna did not possess the requisite medical credentials to render an opinion in this matter. Moreover, her limited evaluation should not have been given any weight.
>
> **C. CONCLUSION**
>
> It is clear from the totality of the evidence, the reports of Dr. Anil Nalluri, Dr. William Diorio and Dr. Bisel that Jason McCollum suffers from the disabling conditions of Generalized Anxiety Disorder, Posttraumatic Stress Disorder, and Major Depression Disorder. It is also clear from this same evidence that he is disabled as the result of the performance of the his [sic] official duties as a Police Officer.

(Emphasis sic.) (Relator's brief at 5-7.)

{¶ 68} To begin, relator is apparently referring to his attending physician, Dr. Nalluri, when he states in his brief "Ohio Police & Fire ignored the opinion of the only medical doctor who examined [him]." (Relator's brief at 6.)

{¶ 69} There is no evidence in the record to suggest that the board "ignored" or failed to consider the reports of Dr. Nalluri. Clearly, the board did not rely on Dr. Nalluri's reports but that does not compel a conclusion that the board "ignored" or failed to consider the reports of Dr. Nalluri. *See State ex rel. Lovell v. Indus. Comm.,* 74 Ohio St.3d 250 (1996).

{¶ 70} Relator's statement that "Dr. Luna-Jones did not possess the requisite medical credentials to render an opinion in this matter," seems to suggest that a psychologist, such as Dr. Luna-Jones, cannot render an opinion on which the board can rely, and that only a psychiatrist can render such an opinion. (Relator's brief at 7.) There is no evidence in the record that relator ever presented such argument to the board or to the DEP. While relator suggests that this argument was made before the board, there is no transcript of the board hearing to support relator's assertion that such argument was made to the board.

{¶ 71} Issues that are not raised administratively cannot be raised in a mandamus action. *State ex rel. Holwadel v. Hamilton Cty. Bd. of Elections,* 144 Ohio St.3d 579, 2015-Ohio-5306, ¶ 47, citing *State ex rel. Quarto Mining Co. v. Foreman*, 79 Ohio St.3d 78 (1997).

{¶ 72} As earlier noted, the standard of proof in mandamus is by clear and convincing evidence. *State ex rel. Stevens v. Indus. Comm.,* 10th Dist. No. 10AP-1147, 2012-Ohio-4408, ¶ 7.

{¶ 73} Relator could have submitted a memorandum of law on the issue during the administrative proceedings. Apparently, he did not. Moreover, the absence of a transcript of the June 27, 2017 board hearing does not assist relator here in meeting his burden of proof. *Stevens* at ¶ 11.

## Conclusion

{¶ 74} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.

/S/ MAGISTRATE
KENNETH W. MACKE

## NOTICE TO THE PARTIES

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).